**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

Jeffrey Wan, individually and on behalf of all others similarly situated,

Plaintiff,

DraftKings Inc.,

Defendant.

Civil Action No. 24-cv-09557

**MEMORANDUM OF LAW IN SUPPORT OF DRAFTKINGS INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................ 1

FACTUAL ALLEGATIONS ........................................ 4

LEGAL STANDARD ........................................ 6

THE VIDEO PRIVACY PROTECTION ACT ........................................ 6

ARGUMENT ........................................ 7

I. Plaintiff Fails To State A Claim Under The VPPA. ........................................ 7

A. Plaintiff Fails To Identify The Content He Allegedly Watched On DK Casino. ........................................ 8

B. The Casino Game Content Identified In The Complaint Is Not Covered By the VPPA Because It Does Not Constitute "Prerecorded Video Cassette Tapes Or Similar Audio Visual Materials." ........................................ 9

C. DraftKings Is Not A Video Tape Service Provider Because The Audio Visual Content Identified In The Complaint Is Peripheral To Its Business. ........................................ 12

D. Plaintiff Fails To Show That Specific Video Content Was Disclosed. ........................................ 15

1. Casino Games ........................................ 15

2. Tutorial Content ........................................ 15

II. Plaintiff Fails To Sufficiently Allege A Wiretapping Act Claim. ........................................ 16

A. DraftKings' Alleged "Interception" Was Consensual Under 18 U.S.C. § 2511(2)(d). ........................................ 17

1. One-Party Consent Is Sufficient Under The Wiretap Act. ........................................ 17

2. The Tort-Crime Exception Does Not Apply Because There Was No Criminal or Tortious Purpose To The Alleged Interception. ........................................ 18

B. The Collected Data Does Not Constitute "Contents" Under the Wiretap Act in This Circuit. ........................................ 20

III. Any Further Amendment Would be Futile and the Complaint Must Be Dismissed With Prejudice. ........................................ 23

CONCLUSION ........................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldana v. GameStop, Inc.*,
No. 22-CV-7063-LTS, 2024 WL 708589, at *2-3 (S.D.N.Y. Feb. 21, 2024), motion to certify appeal denied, 2024 WL 3104345 (S.D.N.Y. June 24, 2024) ....10, 11

*Armstrong v. McAlpin*,
699 F.2d 79 (2d Cir. 1983)....5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....6

*Boddie v. ABC*,
881 F.2d 267 (6th Cir. 1989) ....19

*Cantu v. Sunrun Inc.*,
No. 23-CV-974-JO-AHG, 2023 WL 11795670 (S.D. Cal. Nov. 22, 2023) ....12, 23

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023)....12, 13, 14

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010)....18

*Carroll v. General Mills, Inc.*,
No. CV 23-1746 DSF, 2023 WL 4361093 (C.D. Cal. June 26, 2023) ....12, 14

*In re DoubleClick Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001)....17, 18, 19

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....14

*Foman v. Davis*,
371 U.S. 178 (1962)....23

*Galiano v. Fidelity Nat'l Title Ins. Co.*,
684 F.3d 309 (2d Cir. 2012)....9

*Hernandez v. Jostens, Inc.*,
No. 2:23-CV-05227-HDV-RAO, 2024 WL 1135165 (C.D. Cal. Feb. 7, 2024)....13

*J.H. Desnick v. ABC*,
44 F.3d 1345 (7th Cir. 1995) ....................19

*Jones v. Cap. Cities/ABC Inc.*,
874 F. Supp. 626 (S.D.N.Y. 1995) ....................20

*Jones v.* New *York State Div. of Mil. & Naval Affs.,*
166 F.3d 45 (2d Cir.1999)....................23

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................16, 17

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012)....................6

*Leocal v. Ashcroft*,
543 U.S. 1 (2004)....................22

*Louth v. NFL Enters. LLC*,
No. 21-405, 2022 WL 4130866 (N.D. Cal. 2022) ....................10, 12

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023)....................8, 9, 16

*McDonnell v. United States*,
579 U.S. 550 (2016)....................22

*Mendoza v. Caesars Entm't, Inc.*,
No. 23-CV-03591, 2024 WL 2316544 (D.N.J. May 22, 2024)....................1, 10, 12, 15

*In re Nickelodeon Consumer Priv. Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014)....................21, 23

*Osheske v. Silver Cinemas Acquisition Co.*,
700 F. Supp. 3d 921 (C.D. Cal. 2023), *aff'd*, No. 23-3882 (9th Cir. Mar. 27, 2025) ....................11

*Rodriguez v. Hershey Co.*,
No. *23*-CV-398-L-DEB, 2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) ....................13

*Rosenfeld v. Leni*ch,
370 F. Supp. 3d 335 (E.D.N.Y. 2019) ....................20

*Salazar v. NBA*,
118 F.4th 533 (2d Cir. 2024) ....................14

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022) ....................14

*Sussman v. ABC*,
186 F.3d 1200 (9th Cir. 1999) ....................19

*United States v. Jiau*,
734 F.3d 147 (2d Cir. 2013)....................18

*United States v. Kidd*,
394 F. Supp. 3d 357 (S.D.N.Y. 2019)....................21

*United States v. Lanier*,
520 U.S. 259 (1997)....................22

*United States v. Santos*,
553 U.S. 507 (2008)....................22

*Vita v. New England Baptist Hospital*,
494 Mass. 824 (Mass. 2024)....................22

*Walker v. Meta Platforms, Inc.*,
No. 22-CV-02442-JST, 2023 WL 3607282 (N.D. Cal. Mar. 3, 2023)....................10

*Yates v. United States*,
74 U.S. 528 (2015)....................22

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014)....................21

*In re Zynga*,
750 F.3d at 1107–08....................21, 23

**Statutes & Rules**

18 U.S.C.
§ 2510(8)....................3, 20
§ 2511(2)(d)....................3, 18, 24
§ 2710(a)(1)....................7
§ 2710(a)(3)....................7, 8, 15
§ 2710(a)(4)....................7
§ 2710(b)....................7
§ 2510(4), (8)....................20
§ 2511(2)(d)....................17, 18, 20
§ 2710(a)(4)....................12

Electronic Communications Privacy Act....................20, 21

Wiretap Act, 1 U.S.C. § 2510 et seq. ....................5, 16

**Other Authorities**

https://casino.draftkings.com/how-to-play-blackjack ........................................................15

S. REP. 100-599 (1988) ........................................................6, 7, 16

S. Rep. No. 541, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555 ................20

## INTRODUCTION

Plaintiff Jeffrey Wan's ("Plaintiff") First Amended Complaint ("FAC") does nothing to remedy his fundamentally flawed attempt to expand the Video Privacy Protection Act ("VPPA") and the Federal Wiretap Act ("Wiretap Act") far beyond their intended scope. The VPPA, enacted in 1988 to protect consumers from unauthorized disclosures of specific video materials or services, does not regulate interactive online gaming platforms. Yet Plaintiff alleges DraftKings Inc. ("DraftKings") violated the statute by using a Facebook pixel (the "Pixel") or other tracking technologies in connection with online games on DraftKings Casino ("DK Casino"). The new or revised allegations in the FAC simply double down on Plaintiff's novel and unsupported theory that live, interactive online casino games are the type of "prerecorded" video content that is governed by the VPPA. There is no authority for such a claim, and the VPPA was plainly not intended to apply in these circumstances. Notably, this is Plaintiff's second attempt to plead these claims. Despite being on notice of the same fatal defects, the FAC still fails for all the same reasons the Complaint did. And while the FAC now contains more technical assertions about how the Facebook Pixel or other tools allegedly gather user data, it does not cure the central problem: Plaintiff has not identified any discrete, "prerecorded" video akin to a tape, DVD, or streaming title that would even plausibly qualify under the statute. In short, his amended pleading repackages the same speculative theories in greater technical detail, but fails to add the key facts necessary to establish VPPA and Wiretap Act claims.

A nearly identical VPPA claim involving online casino games was rejected in *Mendoza v. Caesars Entm't, Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *2 (D.N.J. May 22, 2024) ("[I]n arguing that the Act applies to online casino games—a medium far attenuated from the video cassette tapes that motivated the Act's original passage—Plaintiff urges an interpretation of the

VPPA that stretches these flexible terms too far.”). The only reported decisions on whether the VPPA covers video games – to the extent the games on DK Casino even are “video games” – have concluded that the game content itself is not subject to the statute, and that only independent prerecorded scenes within certain physical copies of games might fall under the VPPA. DK Casino does not offer physical copies of its games or independent prerecorded video scenes.

Plaintiff attempts to salvage his claims by asserting—without legal support—that DraftKings’ online casino games are subject to the VPPA because “[t]hey are essentially a string of prerecorded video clips with sound that get activated sequentially based on a user’s selections.” FAC ¶ 78. This conclusory assertion finds no support in the statute. Plaintiff’s overexpansive interpretation of the VPPA is meritless and has no grounding in either its letter or spirit.

DraftKings is also plainly not a “video tape service provider.” The alleged content on DK Casino is neither “prerecorded” nor “similar” to traditional videotapes. Indeed, Plaintiff labels it “games” (see, e.g., FAC ¶ 6), acknowledging its interactive nature. Plaintiff concedes users must actively click or select the game before any content appears (FAC ¶ 7), and does not dispute that each play session varies, altering on-screen animations and sequences in response to user clicks and actions. Even if the Pixel indicated a user clicked into a game, and even if Plaintiff were correct that the VPPA applied to casino games like those found on DK Casino, it would still not disclose a particular prerecorded “video” as required under the VPPA. Each session’s animations depend on user actions, and there is no singular “video” akin to a rented film or show. These ephemeral animations cannot be shoehorned into the VPPA’s domain.

Additionally, Plaintiff does not specify what video content *he* allegedly viewed on DraftKings’ website. Instead, he refers broadly to (1) animations in dynamic, interactive casino games, or (2) instructional content associated with “How to Play” those games, which includes

other non-video instructions and information. Even assuming Plaintiff viewed this content—which he does not sufficiently allege—it is not a movie, rental, or purchasable media. DraftKings is not in the business of selling, renting, or delivering animated clips or tutorials. Customers visit DK Casino to play casino games. This peripheral content is outside the VPPA's scope and does not transform DraftKings into a "video tape service provider" engaging in the rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials.

Plaintiff also asserts a new Wiretap Act claim, alleging that DraftKings unlawfully intercepted and disclosed Plaintiff's electronic communications with its Website to Facebook and other third parties. This claim fares no better than the VPPA claim. Plaintiff alleges, in a conclusory fashion, that DraftKings violated the Wiretap Act when it "intercepted" communications by using common analytics tools (including the Pixel) and shared them with Facebook without his express consent. Yet the Wiretap Act expressly allows one-party consent, 18 U.S.C. § 2511(2)(d), and DraftKings, as a direct participant in the communications with its customers, consented to the Pixel. Nothing in the FAC suggests otherwise. Moreover, the Wiretap Act imposes liability only for "contents" of communications—i.e., the substantive "purport" or "meaning" of messages. See 18 U.S.C. § 2510(8). Standard web analytics data, such as that captured by the Pixel (URLs, IP addresses), do not constitute "contents," particularly where the user's gameplay is interactive and does not involve disclosure of private messages – and in any event, any residual ambiguity must be resolved in DraftKings' favor under the rule of lenity. Plaintiff's Wiretap Act theory thus fails on multiple grounds.

No amount of re-pleading can cure these defects. The FAC should be dismissed with prejudice.

## FACTUAL ALLEGATIONS[1]

Plaintiff alleges that he is a New York resident who used DraftKings' website and application, and played casino games purportedly containing "prerecorded audio visual content." FAC ¶ 6. Specifically, Plaintiff alleges two categories of audio visual content that purportedly violate the VPPA: (1) a "catalog" of casino games containing prerecorded audio visual clips; and (2) instructional content pertaining to various casino games. FAC ¶ 77. He alleges that when a user opens a game and clicks on "elements within the game", short clips or animations autoplay, creating what Plaintiff characterizes as "prerecorded videos." FAC ¶¶ 7, 81 ("often times when a user makes a certain button clicks during the games, additional prerecorded video clips and sound play that move the game along"). The FAC does not identify which specific audio visual segments or games Plaintiff personally viewed. Rather, the FAC references a general "catalog" of casino games, with some "prerecorded audio visual clips," and lumps all of these into "videos." FAC ¶ 77. Plaintiff concedes that the alleged "clips" are in a dynamic, triggered-by-user-input environment and only play when a user interacts with games. FAC ¶ 7 ("clicked on games on Defendant's website, which served Plaintiff prerecorded audio visual content upon loading the game in the form of videos, and also by clicking elements within the game"); ¶ 78 ("They are essentially a string of prerecorded videos clips with sound that get activated sequentially based on a user's selections."). Plaintiff references images and screenshots showing game interfaces (including "Wolf It Up" in Figures 1-2, ¶ 93), but does not describe any single "prerecorded" video with distinct start/end points or a narrative comparable to a DVD or streaming movie.

Plaintiff alleges that DraftKings intentionally disclosed "PII" (Personally Identifiable Information) to Facebook through a "Pixel" and other tracking technologies. FAC ¶¶ 2, 23–29, 33.

[1] As required, and for the purposes of this Motion only, DraftKings relies on facts taken from the Complaint, without accepting their truth.

He contends that these scripts collected user data such as their Facebook ID, pages visited (*i.e.*, "names of specific prerecorded videos and games"), and IP address. FAC ¶¶ 52, 53. He further speculates that an "ordinary person" could use a Facebook ID to identify that user's profile but does not allege how an ordinary person would do that. FAC ¶¶ 56, 91. Importantly, the FAC still does not identify any distinct "video" that Plaintiff specifically viewed, nor does it identify any manner by which information about specific "video clips" selected or viewed by a user are relayed to third parties.

Relying on the same alleged Pixel usage, Plaintiff claims that DraftKings "intercepted" his electronic communications and relayed them to Facebook in violation of the Wiretap Act, 18 U.S.C. §§ 2510 et seq. FAC ¶¶ 2, 70, 102, 124-142. While Plaintiff alleges DraftKings "intentionally divulges the contents of any communication" Plaintiff does not identify what "contents" were divulged. Instead, Plaintiff alleges that the "confidential communications" Plaintiff and members of the Class had with the Website, are in the form of the Pixel's collection of record information regarding their PII and URLs of pages viewed. FAC ¶¶ 132, 133.

Plaintiff seeks to represent a nationwide class of all persons in the United States who, during the maximum period of time permitted by law, used DraftKings' website or applications to view or request prerecorded casino games or videos using their mobile or computer browsers. FAC ¶ 3. Plaintiff alleges his and Class Members' claims have been tolled by delayed discovery.[2] FAC ¶¶ 98-103.

[2] DraftKings disputes any such tolling. At all relevant times, DraftKings posted a clear, conspicuous Privacy Notice on its website – which Plaintiff and all other users consent to by using DraftKings' services-- explicitly informing users of information collected from them, including via cookies, pixel tags, or other technologies. Because a reasonably diligent user would have known of DraftKings' advertising and analytics vendors upon reading its posted Privacy Notice, the clock began to run at the time of each alleged disclosure. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983). Consequently, although DraftKings does not presently move to

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plaintiff cannot rely on a "threadbare" recitation of the elements of a cause of action, but must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[D]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A complaint is properly dismissed where, as a matter of law, the allegations in the complaint, however true, could not raise a claim of entitlement to relief. *Twombly*, 550 U.S. at 558. In reviewing the plausibility of a complaint on a motion to dismiss, the court must assume all well-pleaded facts to be true, drawing all reasonable inferences in favor of Plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do*."* *Twombly*, 550 U.S. at 555.

## THE VIDEO PRIVACY PROTECTION ACT

In 1988, Congress enacted the VPPA in response to a tabloid scandal in which a newspaper exposed Supreme Court nominee Robert Bork's video rental history, revealing his personal and political preferences. *See* S. REP. 100-599, at 5-6 (1988). The VPPA was designed to protect the privacy interests of consumers who rent, purchase, or view prerecorded video materials from

---

dismiss Plaintiff's claim as untimely, the limitations period cannot be tolled, and any claims, including of Class Members, arising outside that window are untimely.

unauthorized disclosures by video stores. *See id.*, at 5. The VPPA reflected Congress's concern that such stores, which collect and maintain sensitive personal information about their customers' viewing preferences, could misuse or divulge that information to third parties without the customers' consent or knowledge. *See id.* at 6-7. To that end, the VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b).

The VPPA's definitions of several key terms are essential to understanding the proper scope of the statute. "Video tape service provider" under the VPPA constitutes "any person engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). "Similar audio visual materials" means "laser discs, open-reel movies, or CDI technology." S. REP. 100-599, at 12 (1988). The statute defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). "Personally identifiable information" is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). None of these definitions are applicable to DraftKings, its casino games, its customers, or the information alleged to have been obtained and transferred.

## ARGUMENT

### I. Plaintiff Fails To State A Claim Under The VPPA.

Plaintiff fails to state a claim under the VPPA upon which relief can be granted. To state a claim under the VPPA, a "plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer,' … (3) the disclosure was made knowingly, and (4) the disclosure was not authorized

by another part of the statute." *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023). The FAC fails to state a claim because, among other reasons, it does not even allege the most basic facts: the identity of the specific audio visual material that Plaintiff purportedly watched on DK Casino, or the specific audio visual material alleged to have been obtained and transferred. *See* 18 U.S.C. § 2710(a)(3) (defining PII as information identifying a person as having requested or obtained specific video materials or services). Moreover, even accepting the FAC's allegations as true, case law and well-settled principles of statutory interpretation make clear that the games offered on DK Casino do not render DraftKings a "video tape service provider" within the meaning of the statute because the alleged video content is peripheral to its business. Simply put, the content that Plaintiff alleges is featured on DK Casino is not the type of material covered by the VPPA, and Plaintiff does not plausibly allege that DraftKings shared information qualifying as PII with any third party.[3]

### A. Plaintiff Fails To Identify The Content He Allegedly Watched On DK Casino.

Plaintiff's VPPA claim against DraftKings is entirely based on his allegation that he "play[ed] games, which contained prerecorded audio visual content and watched prerecorded videos from Defendant's Website." FAC ¶¶ 6-7. As support, the FAC attempts to delineate how the Pixel collects information and provides six screenshots of content purporting to be from DK Casino's website. FAC ¶¶ 55-58, 68-70, 72, 74, 92-93. These allegations, even if accurate, are insufficient to adequately plead a VPPA violation for numerous reasons.

Instead of naming a single discrete prerecorded "video" that Plaintiff personally accessed, the FAC broadly points to a "plethora of audio visual content" and a "catalog of games." FAC ¶ 77.

[3] Though at this time Defendant is not briefing whether the disclosure was made knowingly, with consent, or authorized by another part of the statute, it reserves its right to do so at a later time, and the exclusion of the latter from this Rule 12(b)(6) Motion is not a waiver of those arguments.

The FAC then references certain "prerecorded videos pertaining to various casino games" and claims that "ordinary consumers" see the appended screenshots. FAC ¶¶ 77, 93. But Plaintiff never states that the screenshots he includes actually depict what *he* viewed—and only relies "on information and belief" to say that "ordinary customers" see this. These conclusory and speculative assertions are wholly insufficient to state a claim upon which relief can be granted. *See Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 314–15 (2d Cir. 2012) (affirming dismissal where the complaint failed to allege specific facts supporting the alleged misconduct, instead relying on conclusory and speculative assertions). Plaintiff's failure to identify any specific video content that he actually accessed or viewed is fatal to his claim because the Court, even in the light most favorable to Plaintiff, cannot reasonably evaluate that content to determine whether it is covered by the VPPA, and whether Plaintiff therefore has a viable claim.

Plaintiff has now had two opportunities to allege the core, basic facts in support of his claim. He has failed again. The FAC should be dismissed based on these vague and conclusory allegations. *Galiano,* 684 F.3d at 314–15; *see also Martin*, 657 F. Supp. 3d at 285 (dismissing the complaint where plaintiff primarily relied on generalized allegations).

**B. The Casino Game Content Identified In The Complaint Is Not Covered By the VPPA Because It Does Not Constitute "Prerecorded Video Cassette Tapes Or Similar Audio Visual Materials."**

Nothing within the FAC suggests DraftKings offers "prerecorded video cassette tapes" or "similar audio visual materials" within the meaning of the VPPA. DK Casino provides only live, interactive casino games, which the statute does not reach. See FAC ¶ 7 (alleging that clicking on Defendant's website "served Plaintiff prerecorded audio visual content," but also admitting the content is part of "interactive casino games" driven by user choice. FAC ¶¶ 7, 78–82. This user-driven gameplay bears no resemblance to "prerecorded video cassette tapes or similar audio-visual materials." Indeed, the FAC's own screenshots (FAC at pp. 26–28, Figs. 1–4) depict still images

from interactive casino games and a tutorial page—none of which constitute "prerecorded videos." *See Mendoza* 2024 WL 2316544, at *2–3 (dismissing VPPA claim against online casino games where no prerecorded video content was identified). As in *Mendoza*, Plaintiff here fails to allege any cognizable "video tape service" under the VPPA.

Plaintiff's attempt to wedge these real-time, interactive casino games into the category of "prerecorded videos" is a transparent effort to expand the statute far beyond what Congress intended. The VPPA's legislative history makes clear that it was designed for "prerecorded video cassette tapes or similar audio-visual materials, such as laser discs, open-reel movies, or CDI technology"—not modern digital platforms offering live gameplay, contests, real-time sports, or comparable interactive content. Only one court has considered applying the VPPA to video games—and only did so in connection with the sale of *physical* copies containing full cinematic scenes. *Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *2–3 (S.D.N.Y. Feb. 21, 2024), motion to certify appeal denied, 2024 WL 3104345 (S.D.N.Y. June 24, 2024). In *Aldana*, the court reasoned that the games were manufactured on Blu-ray discs, which could plausibly be deemed "prerecorded." The *Aldana* court's reasoning is inapplicable to DraftKings' purely online, interactive casino games.

Moreover, the FAC's failure to allege audio visual materials "similar" to "prerecorded video cassette tapes" (as opposed live, interactive content) is dispositive. *See Walker v. Meta Platforms, Inc.*, No. 22-CV-02442-JST, 2023 WL 3607282, at *6 (N.D. Cal. Mar. 3, 2023) ("Similar audio visual materials' must be read in a manner that gives meaning to, and that does not render superfluous, the word "prerecorded"); *Mendoza*, 2024 WL 2316544, at *2–3 ("audio visual materials" must include some prerecorded video). Courts also emphasize that "prerecorded" materials can be possessed, stored, or transferred. *See Louth v. NFL Enters. LLC*, No. 21-405, 2022

WL 4130866, at *4 (N.D. Cal. 2022) (live sports broadcasts are not "prerecorded" and thus not analogous to videotapes); *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 925 (C.D. Cal. 2023), *aff'd*, No. 23-3882 (9th Cir. Mar. 27, 2025) ("delivering" audiovisual content under the VPPA requires transferring a possessory interest).

Here, Plaintiff's conclusory allegations of "watch[ing] prerecorded videos on Defendant's Website" (FAC ¶ 6–7) fail precisely because the FAC omits any details identifying which "videos" were viewed, how they were prerecorded, how they were "rented" (FAC ¶ 116) or purchased. Plaintiff only claims these "clips" appear during gameplay (in unidentified games) as part of user-initiated interactions. FAC ¶¶ 7, 81. But this makes them more akin to transitory in-game animations than fixed, independently viewable media. Plaintiff never alleges these sequences can be stored, replayed, or sold. The FAC's unsupported assertion that some unspecified files "download" to the user's browser does not convert a dynamic gaming function into prerecorded video cassette tapes or similar audio visual content. FAC ¶ 83. Nor does Plaintiff allege any possessory interest in these ephemeral animations. *See Osheske*, 700 F. Supp. 3d at 925. Indeed, Plaintiff does not allege that a user can watch these "videos" or even play these games apart from the interactive game environment. This stands in stark contrast to renting or purchasing prerecorded media for repeated viewings—the only conduct Congress actually sought to regulate. *See Aldana*, 2024 WL 708589, at *6. No reported case has extended the VPPA to online games the way Plaintiff proposes here, and this Court should decline to do so.

Plaintiff has now had two bites at the apple to plead around these issues and still omits basic facts like which video(s) were allegedly viewed, purchased, or rented. Such persistent omissions confirm there is no viable VPPA claim here. Accordingly, because Plaintiff has not plausibly alleged that DraftKings offers the type of "prerecorded" audio visual materials the VPPA governs,

this claim must be dismissed as a matter of law. *See Mendoza*, 2024 WL 2316544, at *3; *Louth*, 2022 WL 4130866, at *4.

### C. <u>DraftKings Is Not A Video Tape Service Provider Because The Audio Visual Content Identified In The Complaint Is Peripheral To Its Business.</u>

Even had Plaintiff identified discrete prerecorded "videos" (and he has not), the VPPA still requires that a defendant be "engaged in the business" of renting, selling, or delivering this media. 18 U.S.C. § 2710(a)(4). The FAC does not plausibly allege that DraftKings is in that business. At most, it merely alleges that DraftKings offers interactive gaming content, supplemented with short tutorial videos or in-game animations that are incidental to the gaming content. Plaintiff has not alleged *how* these ancillary elements are more than peripheral to DraftKings' business, and his claim thus fails as a matter of law.

Courts have made clear that the VPPA "does not cover every company that merely delivers audio visual materials ancillary to its business." *Carroll v. General Mills, Inc.*, No. CV 23-1746 DSF (MRWX), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023). Rather, to be "engaged in the business" under the VPPA "connotes a particular field of endeavor" or a "focus of the defendant's work." *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023) (internal citations omitted). "[I]t is not enough that the defendant is engaged in the delivery of video content "peripherally or passively." *Id.* at 993. In *Cantu*, for example, the court held that "hosting and creating prerecorded videos for the purpose of marketing its products does not suffice to plausibly allege Defendant is a video tape service provider." *Id.* at 993; *see also Carroll*, 2023 WL 4361093, at *3 (dismissing VPPA claim based on operation of website that featured video clips related to its primary business of food manufacturing, such as recipes, food, and cooking content).

Courts have also consistently rejected VPPA claims against businesses that merely use audio visual content to market, promote, or facilitate the sale of their primary products or services.

Where prerecorded videos are not the product itself, their incidental use does not transform a company into a video tape service provider under the statute. *See, e.g.*, *Rodriguez v. Hershey Co.*, No. *23*-CV-398-L-DEB, 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023) (holding that a company using videos for marketing purposes is not a "video tape service provider" under the VPPA where the delivery of audio visual content was ancillary to its business, dismissing the claim without leave to amend); *Hernandez v. Jostens, Inc.*, No. 2:23-CV-05227-HDV-RAO, 2024 WL 1135165, at *2 (C.D. Cal. Feb. 7, 2024) (holding that prerecorded videos on a company's website used to promote its products did not render it "engaged in the business" of delivering video content under the VPPA, noting that the videos were peripheral to its primary business of selling yearbooks and class pictures). The court in *Hernandez* further emphasized that even significant expenditures to produce and host video content do not establish that video delivery is central to a company's business, dismissing the claim with prejudice. *Hernandez*, 2024 WL 1135165, at 2.

Plaintiff's VPPA claim fails for the same reasons. Just as marketing materials support a business's primary product or service – but are not, themselves, the product or service – the content at issue here, particularly DraftKings' tutorial video content, as identified in the FAC (¶ 93, Figures 3 and 4), serves merely to facilitate DraftKings' online casino operations. In the same way that promotional videos help attract customers without transforming a company into a video tape service provider, tutorial content aids user engagement but remains incidental to DraftKings' core offering of interactive online casino games. The Complaint itself concedes this point as Plaintiff alleges DraftKings' business as "operat[ing] an online casino through its Website." FAC ¶ 77. Any tutorial or instructional videos on DK Casino or animations within its interactive casino games are peripheral as they exist solely to support gameplay and serve no independent function as standalone content. *See id.*; *Cantu*, 697 F. Supp. 3d at 994. Courts in similar circumstances have consistently

held that businesses do not qualify as video tape service providers when video content is incidental rather than central to their operations. *See, e.g.*, *id.* at 993; *Carroll*, 2023 WL 4361093, at *3. Any attempt by Plaintiff to expand the scope of the VPPA to cover DK Casino is unsupported by the statute's text, history, and case law. *See Eichenberger v. ESPN, Inc*., 876 F.3d 979, 985 (9th Cir. 2017) (declining to read statute "to cover circumstances so different from the ones that motivated its passage."); *Stark v. Patreon, Inc*., 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) (declining to extend the VPPA to live broadcasts). DraftKings' tutorial content is incidental to its online casino business.

Additionally, to the extent Plaintiff attempts to save his claim by relying on *Salazar v. NBA,* that attempt is misplaced. In *Salazar*, the National Basketball Association ("NBA") was held to be a "video tape service provider" because it offered *standalone* prerecorded video content on its website. *See Salazar v. NBA*, 118 F.4th 533, 537 (2d Cir. 2024). The court's decision in *Salazar* was based on the NBA's direct offering of prerecorded on-demand video content to consumers through its website and newsletter. *Id.* at 536-37. In other words, the NBA offered prerecorded video to customers *specifically seeking out* said video. Unlike the NBA, DraftKings does not sell, rent, or deliver prerecorded video content on DK Casino, and through DK Casino it operates an interactive gaming platform, where audio visual elements—such as in-game animations and instructional content—are incidental to the gaming experience, and are not the product itself. *See Cantu*, 697 F. Supp. 3d at 993; *Carroll*, 2023 WL 4361093, at *3. *Salazar* is thus readily distinguishable and does not alter the conclusion that DraftKings is not a video tape service provider under the VPPA.

### D. Plaintiff Fails To Show That Specific Video Content Was Disclosed.

#### 1. Casino Games

The VPPA requires that the disclosed information specifically identify the 'video materials' a particular person requested or obtained.[4] 18 U.S.C. § 2710(a)(3). Plaintiff fails to sufficiently plead such a disclosure in connection with the casino game content. Figures 1 and 2 (¶ 93) purport to identify certain games offered on DK Casino. Plaintiff alleges that the Facebook Pixel obtained the names of those games, or the website page name. FAC ¶¶ 77, 93-94, Figures 1-2. However, this is insufficient to state a claim because the *game* is an interactive (not prerecorded) platform that is not covered by the VPPA. *Mendoza*, 2024 WL 2316544, at *3. To the extent any "prerecorded" content is contained *within* those games, Plaintiff does not identify what the prerecorded content is. Without clearing this initial bar, Plaintiff does not plausibly allege or identify any specific prerecorded video content that was actually requested or obtained by a particular person, as required to state a VPPA claim. *See* 18 U.S.C. § 2710(a)(3).

#### 2. Tutorial Content

Likewise, regarding the tutorial content in Figures 3 and 4 of the Complaint, the screenshots merely show a webpage with written information and instructions regarding how to play Blackjack that also appear to show a small video window embedded within that page. FAC ¶ 94, Figures 3-4. The purported video content identified in Figures 3 and 4 does not appear to have its own distinct webpage, page name, or URL – it is simply one part of the webpage https://casino.draftkings.com/how-to-play-blackjack, which also contains non-video content.

When a webpage contains multiple videos, clips, or other content, the disclosure must indicate which specific video materials were accessed by the visitor (if any). It must also clarify

[4] Plaintiff alleges that DraftKings transmits "Personal Viewing Information," but never defines what that phrase means. FAC ¶¶ 85, 93 (Figures 2 & 4).

whether the visitor actually requested or obtained a video or clip, or if they simply played a game or read an article on the webpage. *See Martin* 657 F. Supp. 3d at 285 (holding that disclosure of a URL for a webpage with video and non-video content does not identify a person as having requested or obtained specific video materials because a person may have "merely reviewed an article" and done nothing more). Consumers visiting the Blackjack tutorial webpage identified in the FAC may read the written content on the page without ever watching the video. Even if that webpage information were obtained and disclosed to Facebook by DraftKings, it would not be clear if the person associated with the Facebook ID was a consumer of the video media on the webpage. There is therefore no violation of the statute, and no risk of the realization of Congress's concern that third parties could misuse or divulge individuals' viewing preferences and histories. *id.*; *see also* S. REP. 100-599, at 5.

**II. <u>Plaintiff Fails To Sufficiently Allege A Wiretapping Act Claim.</u>**

Plaintiff asserts a claim under the Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., alleging that DraftKings, through tracking tools (*e.g.*, the same Facebook Pixel that gives rise to Plaintiff's VPPA claim), "intercepted" and shared Plaintiff's interactions without proper consent or notice. *See* FAC ¶¶ 2, 7–11, 133–35. Plaintiff's Wiretapping Act claim fails for several reasons. First, DraftKings is a direct participant in the communications at issue and consented to any tracking that occurred by third party analytics tools it implemented on its online gaming platforms. Second, Plaintiff affirmatively agreed to DraftKings collecting and sharing Plaintiff's data in accordance with DraftKings' privacy policy and terms of use. Third, Plaintiff has not alleged, and cannot allege, any criminal or tortious motive with any plausibility. And finally, even taking Plaintiff's allegations at face value, only non-content information was collected.

### A. DraftKings' Alleged "Interception" Was Consensual Under 18 U.S.C. § 2511(2)(d).

#### 1. One-Party Consent Is Sufficient Under The Wiretap Act.

Plaintiff's Wiretap Act claim must be dismissed because any "interception" was done with the consent of DraftKings, at a minimum. Under the Wiretap Act, "[i]t shall not be unlawful ... to intercept a ... communication where ... one of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(d). Courts in this District and others have held that one-party consent is an "absolute defense," and that an interception must involve "the contents" of a communication to be actionable. *See* 18 U.S.C. § 2511(2)(d); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 510-512 (S.D.N.Y. 2001); *Katz-Lacabe v. Oracle Am.*, Inc., 668 F. Supp. 3d 928 (N.D. Cal. 2023) (holding that the Wiretap Act's one-party consent exception applied where affiliated websites consented to the interception of users' communications, defeating claims based on data collection via cookies).

A website operator may consent to, and thus the Wiretap Act does not prohibit, "intercepting" traffic it directly receives. *In re DoubleClick*, 154 F. Supp. 2d at 514–15 (finding consent where alleged interception concerned communications to which the defendant was already a party). An interception is exempt if "one of the parties to the communication has given prior consent to such interception," unless the defendant's primary motivation is a criminal or tortious act. 18 U.S.C. § 2511(2)(d). Plaintiff's own allegations confirm that the challenged transmissions arose from his direct interactions with DraftKings' website—page visits, video viewing, and so forth. FAC ¶¶ 7, 85–86. DraftKings is thus the direct recipient of those communications and there can be no violation of the Wiretap Act.

Plaintiff concedes this point, admitting that "the Wiretap Act allows a single party to consent to the interception of an electronic communication." FAC ¶ 28. With no other option remaining, he

attempts to avoid the one-party consent defense by invoking 18 U.S.C. § 2511(2)(d) which negates that defense if (and only if) the interception was "for the purpose of committing any criminal or tortious act." *Caro v. Weintraub*, 618 F.3d 94, 96 (2d Cir. 2010) ("[We]…hold that the exception to the one-party consent provision of 18 U.S.C. § 2511(2)(d) requires that a communication be intercepted for the purpose of a tortious or criminal act that is independent of the intentional act of recording."). Yet both caselaw and legislative history make clear this requirement cannot be satisfied by merely alleging that the conduct *incidentally* violates some other legal duty. As explained below, the exception does not apply here.

#### 2. The Tort-Crime Exception Does Not Apply Because There Was No Criminal or Tortious Purpose To The Alleged Interception.

Even if DraftKings' alleged collection of Plaintiff's communications was unlawful – and it was not – Plaintiff's Wiretap Act claim would still fail because Plaintiff cannot allege that DraftKings acted with the primary intent of committing a criminal or tortious act. As Plaintiff himself concedes in his FAC, any "interception" was for marketing purposes, and not done with any criminal or tortious intent.

In *In re DoubleClick*, the court exhaustively analyzed the tort-crime exception to consent under § 2511(2)(d) of the Wiretap Act in the context of website tracking and advertising. *DoubleClick,* 154 F. Supp. 2d at 514–15. As that court held, "Section 2511(2)(d)'s legislative history and caselaw make clear that the "criminal" or "tortious" purpose requirement is to be construed narrowly, covering only acts accompanied by a specific contemporary *intention* to commit a crime or tort." *Id.* at 515. Over decades of interpreting § 2511(2)(d), courts have uniformly rejected the notion that any alleged statutory or common-law violation by itself triggers the "criminal or tortious purpose" *proviso*. *United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013) ("[R]ecordings made for the purpose of perpetrating "criminal" or "tortious" acts, is to be construed

narrowly. It is confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party.") Indeed, *DoubleClick* squarely holds that a plaintiff cannot establish a defendant acted with a criminal or tortious purpose simply by proving that the defendant committed *any* tort or crime. *DoubleClick,* 154 F. Supp. 2d at 518–19.[5] In sum, the mere allegation that a defendant committed an unlawful act does not by itself show that the defendant's *purpose* was tortious.

Applying these principles, the FAC does not and cannot plausibly allege that DraftKings' *primary motivation* in collecting URL data or user activity was to commit a separate crime or tort. On the contrary, Plaintiff concedes that "Defendant's motivation for using the Facebook Tracking Pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for." FAC ¶ 54. At most, the FAC alleges that DraftKings engaged in routine analytics and marketing similar to the defendant in *DoubleClick*. 154 F. Supp. 2d at 518–19. Because there is no "specific contemporary intention" to injure or defraud, *see id.* at 515, the "criminal or tortious purpose" exception cannot be invoked. *See id.* at 519 (dismissing Wiretap claims even though DoubleClick's tracking technology was alleged to have invaded privacy: "…a culpable mind does not accompany every tortious act.").

---

[5] In fact, every court to have considered this question has held that the exception does not lie when the defendant is alleged to have only incidentally committed a tort or crime. *See, e.g., Sussman v. ABC*, 186 F.3d 1200 (9th Cir. 1999) (explaining that the "focus" is "whether the purpose for the interception—its intended use—was criminal or tortious," not whether "the interception itself violated another law." *Id.* at 1202 (citing *Payne v. Norwest Corp., 911 F. Supp. 1299, 1304* (D. Mont. 1995), *aff'd in part, rev'd in part,* 113 F.3d 1079 (9th Cir. 1997)); *J.H. Desnick v. ABC*, 44 F.3d 1345, 1353 (7th Cir. 1995) (same); *Boddie v. ABC*, 881 F.2d 267, 270 (6th Cir. 1989) (same).

Plaintiff's attempt to rely on "intrusion upon seclusion" as the underlying tort also fails because New York does not recognize that common-law tort. *See Jones v. Cap. Cities/ABC Inc.*, 874 F. Supp. 626, 628 (S.D.N.Y. 1995) (underscoring that "New York does not recognize the common law tort of invasion of privacy"). Absent a recognized tort under New York law, Plaintiff cannot establish a "tortious purpose" under § 2511(2)(d).

### B. The Collected Data Does Not Constitute "Contents" Under the Wiretap Act in This Circuit.

Plaintiff's wiretapping claim fails for the additional reason that the FAC does not sufficiently allege DraftKings received the "contents" of Plaintiff's communications. An "interception" under the Wiretap Act occurs only if a defendant receives "the contents of any wire, electronic, or oral communication," defined to include "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8). "Contents" refers to the *intended message* conveyed by the communication, and does not include so-called record information regarding the characteristics of the message that is generated in the course of the communication. *See* 18 U.S.C.A. § 2510(8) (defining "contents" for the purposes of the Electronic Communications Privacy Act (Wiretap Act is Title 1 of the "ECPA") as "any information concerning the substance, purport, or meaning of [the intercepted] communication"); S. Rep. No. 541, 99th Cong., 2d Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3567 (noting that the ECPA was amended to "exclude from the definition of the term 'contents,' the identity of the parties or the existence of the communication ... thus distinguish[ing] between the substance, purport or meaning of the communication and the existence of the communication or transactional records about it"); *Rosenfeld v. Leni*ch, 370 F. Supp. 3d 335, 347–48 (E.D.N.Y. 2019) (explaining that, under the ECPA, "contents" refers to the substance or meaning of a communication and does not

include caller identity or mere existence of the communication (citing *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014)).

Here, Plaintiff alleges only that DraftKings received data showing a record of his internet activity while browsing DraftKings' website—*i.e.*, which webpages he viewed, which buttons he clicked, or which casino games he played or "prerecorded videos" he watched. *See*, *e.g.*, FAC ¶¶ 53, 57–59. Yet none of that information is "the intended message conveyed" of any "communication." *Zynga*, 750 F.3d at 1106. These cookies, numerical IDs, and the occasional snippet referencing the page or game name do not convey any private conversation or message "meaning." Indeed, a standard webpage address (URL) or game title is deemed "record information" akin to an address or heading, not an actual communication's substance. *Id.* at 1107–08 ("…the webpage address identifies the location of a webpage a user is viewing on the internet, and therefore functions like an 'address.'"); *accord In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *15 (D.N.J. July 2, 2014) (holding "the file path and video title information contained in the URLs allegedly intercepted" are not contents).

Plaintiff's additional references to user identifiers—such as the "c_user cookie," "fr cookie," and "_fbp cookie" (FAC ¶¶ 57–59)—fail for the same reason: these are "classic 'record' information," not the substance of a user's private conversation. *See Zynga*, 750 F.3d at 1106–07 ("There is no language in ECPA equating 'contents' with personally identifiable information."). Even if the c_user or fr cookie can theoretically identify the user's Facebook profile, it still does not convey the "meaning" of any purported user communication. IP addresses identify a device, not a conversation; Facebook IDs identify an account, not the message's substance. *United States v. Kidd*, 394 F. Supp. 3d 357, 362 (S.D.N.Y. 2019) ("[M]ost courts have adopted a categorical

approach holding that users have no reasonable expectation of privacy in such IP address information."). Nothing in the FAC alters that conclusion.

Moreover, if there is any ambiguity as to whether the data collected by the Pixel is content, the Court should dismiss the Wiretap Act claim under the rule of lenity. The canon "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," *United States v. Santos*, 553 U.S. 507, 514 (2008), and "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The Supreme Court in a litany of decisions has made clear that ambiguous statutes must be interpreted narrowly so they are not used to prosecute innocent conduct. *See, e.g., McDonnell v. United States*, 579 U.S. 550, 574–76 (2016) (interpreting the term "official act" within the Hobbs Act and honest services statute narrowly to avoid vagueness concerns); *Yates v. United States*, 74 U.S. 528, 547-49 (2015) (citing the rule of lenity in providing a limiting construction of the term "tangible objects" within the Sarbanes-Oxley Act). That narrow construction is essential because the Wiretap Act "has both criminal and non criminal applications," requiring uniform interpretation across contexts. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). Even if the Court perceives residual ambiguity after normal statutory analysis, the rule of lenity requires dismissal of Plaintiff's § 2511 claim. Here, if any ambiguity exists as to whether the phrase "information concerning the substance, purport, or meaning" reaches bare URLs, cookie strings, or numeric IDs, lenity resolves that doubt in DraftKings' favor and confines the Act to interceptions revealing an actual intended message. *See Vita v. New England Baptist Hospital*, 494 Mass. 824, 1204 (Mass. 2024) (finding ambiguity as to "whether browsing and interacting with a public website are a "wire communication" and holding defendant is entitled to the benefit of any rational doubt under the rule of lenity).

Accordingly, the alleged transmission of numeric IDs, IP addresses, or generic page/game names is insufficient to state a "contents"-based interception claim under the Wiretap Act. As multiple courts have recognized, collecting such "record information" or "addressing information" simply does not reveal "the substance, purport, or meaning" of a user's private communications and therefore falls outside the scope of wiretap liability. *In re Zynga*, 750 F.3d at 1107–08; *In re Nickelodeon*, 2014 WL 3012873, at *15.[6]

### III. <u>Any Further Amendment Would be Futile and the Complaint Must Be Dismissed With Prejudice.</u>

It is well established that leave to amend a complaint need not be granted when amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962); *Jones v.* New *York State Div. of Mil. & Naval Affs.,* 166 F.3d 45, 50 (2d Cir.1999) (holding that "a district court may properly deny leave when amendment would be futile."). With regard to the VPPA claim, even if Plaintiff were to amend the complaint to allege specific video content watched on DraftKings' website, the fundamental deficiencies of this claim would remain and are incurable: DraftKings is not a video tape service provider under the VPPA; and the content at issue—incidental to DraftKings' business—is not "prerecorded" audio visual material covered by the statute. Plaintiff's claim, fatally defective from inception, cannot be revived by amendment. *Cantu v. Sunrun Inc.*, No. 23-CV-974-JO-AHG, 2023 WL 11795670, at *3 (S.D. Cal. Nov. 22, 2023) (dismissing VPPA claim with prejudice where defendant's videos were incidental to its core business). With regard to the Wiretap Act claim, amendment would be equally futile. Plaintiff affirmatively pleads that DraftKings deployed the Facebook Pixel for advertising and analytics purposes (FAC ¶ 54),

[6] Although Plaintiff alleges that third parties intercepted "search terms," the Complaint never clarifies whether these involved manual keyword queries or merely routine navigation within the platform. FAC ¶ 2. Nor does it identify any particular "search term" that might reveal personal or sensitive content. This lack of specificity precludes any conclusion that the supposed "search terms" disclosed meaningful private information.

foreclosing any plausible allegation that the interception was undertaken "for the purpose of committing any criminal or tortious act" under § 2511(2)(d). That concession leaves DraftKings' one-party consent as a complete defense.

No repleading can save Plaintiff's claims. Plaintiff has already had one opportunity to amend and failed. The Court should dismiss the FAC with prejudice.

## CONCLUSION

For the foregoing reasons, DraftKings respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice.

DATED: April 28, 2025

By: *__/s/ Scott C. Hall__*
Richard R. Patch (pro hac vice)
Scott C. Hall (pro hac vice)
Mari S. Clifford (pro hac vice)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500
Telephone: (415) 391-4800
Facsmile: (415) 989-1663
Email: ef-rrp@cpdb.com
ef-sch@cpdb.com
ef-msc@cpdb.com

James T. Sandnes
SKARZYNSKI MARICK & BLACK LLP
One Battery Park Plaza, 32nd Floor
New York, NY 10004
Telephone: (212) 820-7700
Email: jsandnes@skarzynski.com